## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THREE RIVERS HYDROPONICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 2:15-cv-00809 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| FLORISTS' MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

This is an insurance case focused on claims related to the business of growing organic basil. Now before the Court are cross Motions for Summary Judgment arising from a dispute related to Plaintiff Three Rivers Hydroponics' ("TRH") first-party insurance coverage claim under an insurance policy ("Policy") issued by Defendant Florists Mutual Insurance Company ("Florists").

This case arose out of a June 2014 explosion and fire involving a "ozone system" used to hydroponically grow crops at Plaintiff's commercial greenhouse. Plaintiff now contends that its organic basil crop failed not as a result of that explosion/fire but as a result of the ozone system's mechanical failure before that incident. After an extensive claims investigation process, Defendant denied Plaintiff's claim for crop loss damages. Plaintiff contends that Defendant breached the Policy terms by denying its claim for crop loss damages and also argues that Defendant acted in bad faith in investigating and then denying that claim. Finally, Plaintiff argues that it is entitled to consequential damages attributable to Florist's alleged breach of the insurance contract, including

damages related to the loss of its business. (Am. Compl., ECF No. 158, ¶¶ 130–140, 151 [hereinafter Am. Compl.].)

Plaintiff's First Amended Complaint made three claims against Florists: Breach of Contract; Bad Faith; and Civil Conspiracy. (Am. Compl.) The Complaint also made three separate claims against Florists' agent, the Hartford Steam Boiler Inspection and Insurance Company ("HSB"). (*Id.*) By prior Opinion and Order, the Court granted Defendant HSB's Motion to Dismiss all claims against it; the Court also granted Florists' Motion to Dismiss and Strike Portions of Plaintiff's Amended Complaint in part, dismissing Count IV (a claim for Civil Conspiracy) against Florists. (ECF Nos. 194, 195.) Remaining in the Amended Complaint are Counts I and III, respectively alleging breach of contract and bad faith against Florists. (ECF No. 195.)

Plaintiff filed a motion for partial summary judgment on both the breach of contract and bad faith claims, reserving only the question of consequential damages. (ECF No. 274.) Defendant responded with a cross motion for summary judgment on both claims, including by moving in the alternative for summary judgment on the question of consequential damages. (ECF No. 279.) Both motions are fully briefed and ripe for disposition. For the reasons explained below, the Court DENIES Plaintiff's Motion for Summary Judgment in full and GRANTS Defendant's Motion for Summary Judgment in full.

I.    **BACKGROUND**

Plaintiff was a business that hydroponically grew and distributed produce to Pittsburgh-area consumers through contracts with large distributors. Plaintiff used an ozone system to treat and disinfect the water it used for crop production. Plaintiff first contacted Defendant when, on June 30, 2014, a component of that ozone system—specifically, the ozone generator—caught fire.

Plaintiff's crop failed after that incident and Plaintiff asserts that it was unable to profitably grow another crop. Plaintiff claims that it lost all of its clients by January 2015, causing it to default on bank loans and ultimately resulting in the loss of its business.

Plaintiff was insured at all relevant times by a "business package" insurance policy issued by Defendant. (Am. Compl. ¶¶ 20–22.) Plaintiff submitted equipment breakdown and crop loss claims to Defendant. On August 6, 2014, Defendant tendered $7,341.85 to Plaintiff to cover the cost of the ozone generator. (*Id.* ¶ 80.) Following a series of evaluations by various consultants retained by the parties over the course of a year and a half, Defendant denied the balance of Plaintiff's claims in December 2015.

## A.  <u>Policy Provisions at Issue</u>

The parties dispute whether Plaintiff's claims are covered under two particular Policy provisions: (1) the Business Personal Property provision; and (2) the Equipment Breakdown Boiler and Machinery Coverage Endorsement.

The Business Personal Property provision includes coverage for crop loss with seasonal coverage limits of $26,000 per occurrence in the month of June, subject to a $500 deductible. (Def.'s SMF, ECF No. 281, ¶ 12 [hereinafter Def.'s SMF].) But that Business Personal Property provision excludes from coverage damage resulting from "[m]echanical breakdown, including rupture or bursting caused by centrifugal force." (*Id.* ¶ 14.) This provision is therefore only

applicable to the claims for damage from the fire and does not apply to Plaintiff's claims for loss resulting from the mechanical breakdown of system components.[1]

Second, the Policy contains an optional Equipment Breakdown Boiler and Machinery Coverage endorsement, which provides Equipment Breakdown coverage subject to a limit of $300,000 and optional coverage for perishable goods with an occurrence limit of $26,000 for the month of June. (Def.'s SMF ¶ 15.) That Endorsement provides that Defendant agrees to pay for loss caused by or resulting from any "Accident" to "covered equipment." (Pl.'s SMF, ECF No. 287 ¶ 8 [hereinafter Pl.'s SMF].) The policy defined an "Accident" as "direct physical loss" including "[m]echanical breakdown, including rupture or bursting by centrifugal force." (*Id.* ¶ 9.) This endorsement is therefore the only Policy provision under which Plaintiff could recover for a claim that the ozone system components suffered a "mechanical breakdown."

## B.  **The June 30, 2014 Fire**

On July 7, 2014, Plaintiff reported an equipment breakdown and crop loss claim to Defendant describing a June 30, 2014 incident in which "something failed and caused a small explosion/fire in the equipment." (Pl.'s SMF ¶¶ 28–31; Def.'s SMF ¶¶ 23–25.) Defendant accordingly opened a claim and assigned Senior Claim Representative Eric Jones to handle it. (Def.'s SMF ¶ 26.) Jones spoke with Plaintiff co-owner Dave McCullough, who advised that he had heard an "explosion and saw flames shooting out of the equipment." (*Id.* ¶ 27; Pl.'s SMF ¶ 30.) McCullough reported that he turned the equipment off to avoid further damage. (Def.'s SMF

---

[1] Plaintiff's initial claim that the June 30, 2014 fire damaged the entire ozone system appeared to seek recovery under the Business Personal Property provision. Plaintiff now concedes that the fire on that date did not cause its crop loss. (ECF No. 290, at 21.) Instead, Plaintiff now argues that it instead suffered the loss of various ozone system components, including the "ORP controller and/or ORP sensor," because of an "equipment breakdown" at some time before the fire. (*Id.*) The Business Personal Property provision, however, excludes damage resulting from mechanical breakdown and is therefore inapplicable to those claims.

¶ 27.) McCullough also advised Jones that Plaintiff had been losing plants to disease before the explosion—a crop loss cause which Jones advised Plaintiff that the Policy does not cover. (*Id.*)

Days later, however, McCullough reported to Defendant that the ORP controller (or "ORP transmitter")[2] showed a "check sensor" reading, which he believed suggested that the ORP transmitter was having trouble communicating with the ORP sensor. (Pl.'s SMF ¶ 35.) McCullough then reported his belief that the ORP controller broke down, failed to communicate with the sensor, and caused the system to release enough ozone to "over-steriliz[e]" the crops and cause them to fail. (*Id.* ¶¶ 34–35.) Plaintiff also sent Defendant a report from Penn State Plant Disease Clinic Coordinator Sara R. May, finding that basil samples collected before and after the explosion incident displayed no disease pathogens and suggesting that an "abiotic," or non-disease factor caused the crop failure symptoms. (*Id.* ¶ 36; Def.'s SMF ¶ 32; ECF No. 288 ¶ 34.)

In July 2014, Plaintiff submitted an estimate of $41,553.50 for a full replacement of the entire Ozone system. (Am. Compl. ¶ 45.) After that claim submission, a series of claim and damage evaluations ensued.

**C.  Claim Investigations**

1.  The Donan Evaluation

The day of Plaintiff's claim report (July 7, 2014), Defendant retained Donan Engineering ("Donan"), a national engineering firm that Defendant had used in the past, to investigate the cause and extent of the damage to the ozone system and crops. (Def.'s SMF ¶¶ 28–29.) Sam Landis, one

---

[2] The ORP controller works in conjunction with the ORP sensor like a thermostat to regulate the amount of ozone in the crop water. (Pl's SMF ¶ 23.) "[W]hen the ORP sensor detects a millivolt reading in the crop water below the set point, the ORP sensor through the preamplifier circuit sends a signal to the ORP transmitter to activate the ozone generator and produce ozone; when the ORP Sensor detects a millivolt reading in the crop water that achieves the set point, the ORP sensor sends a signal through the preamplifier circuit to the ORP transmitter to shut down the production of ozone." (*Id.*)

of Donan's fire and explosion investigators, visited the TRH greenhouse the next day. (*Id.* ¶ 30.) Landis evaluated the ozone system, confirmed that a small fire had occurred, and recommended that an electrical engineer evaluate the equipment. (*Id.* ¶¶ 30–31.)

Ten days later, on July 18, 2014, Donan sent electrical engineer James R. Graf to visit the TRH site, where he conducted a study of the ozone system to determine the damage's cause. (*Id.* ¶ 35.) Graf is a professional engineer and certified fire and explosion investigator with experience evaluating failures in electrical systems and machines. (*Id.* ¶ 36.) But Graf had no experience evaluating ozone systems—which he acknowledged, telling Plaintiff's representatives that theirs was the first ozone system he had evaluated and that he had "Google[d]" the system to learn how it worked. (Am. Compl. ¶ 49.) Graf took photos of the generator on that day, photos that Defendant contends show that the fire damage was minimal and confined to the generator. (Def.'s SMF ¶¶ 37–38.) Graf's inspection, however, was limited to "visual observations and an interview of the company representative" and he did not test the ORP controller or other system components. (Pl.'s SMF ¶ 41.)

In a report issued August 1, 2014, 25 days after the claim was submitted, Graf concluded that only the ozone generator had sustained damage as a result of the fire, and that a complete replacement of the system was unnecessary. (Def.'s SMF ¶ 37.) Graf also concluded that the high concentration of ozone in the system was likely attributable to factors such as operator error or incorrectly sized or defective equipment and that any high concentration of ozone occurred before the generator's failure. (*Id.*) Plaintiff expressed its disagreement with Graf's findings and conclusions in an August 5, 2014 email to Defendant, rejecting Graf's conclusion that the high

ozone levels were attributable to non-covered causes such as user error. (*Id.* ¶ 40; Pl's SMF ¶¶ 42, 45.)

Also on August 5, Simpson Environmental Services ("Simpson"), the manufacturer of the ozone generator, and with whom Plaintiff had consulted before on its ozone system's installation, prepared a quote for a replacement ozone generator for Defendant. (Def.'s SMF ¶¶ 39, 41–42.) Based on this quote, Defendant issued Plaintiff a check in the amount of $7,341.85 to replace the ozone generator. (*Id.* ¶ 47.)[3]

In response to Plaintiff's disagreement with Graf's report and Plaintiff's request for further testing, Defendant also hired Simpson to conduct a second evaluation of the system. (Def.'s SMF ¶¶ 40, 43–44, 48.) On August 6, 2014, one day after Simpson submitted its quote, Defendant asked Simpson to arrange directly with Plaintiff to inspect the ozone system and advised Plaintiff that Simpson would contact them to do so. (*Id.* ¶¶ 43–44; Pl.'s SMF ¶ 51.) That same day, Simpson advised Defendant that it had contacted Plaintiff and Plaintiff refused to permit them to come and inspect the equipment. (Def.'s SMF ¶ 45.) In this regard, Plaintiff states that it "deferred [Simpson's] visit until such time as it could have a third party evaluate its ozone system." (ECF No. 288 ¶ 45.). In other words, the Plaintiff did not permit Simpson to come to its facility and conduct its planned inspection as arranged by the Defendant.

On August 18, 2014, Plaintiff advised Defendant that it would not accept the check Defendant issued for the replacement generator. (Def.'s SMF ¶ 51.) Plaintiff advised that it

---

[3] Defendant addresses the price differential between this figure and Plaintiff's estimate by explaining that the quote for a replacement ozone system submitted to Defendant by Plaintiff had upgraded components from TRH's original system, including double the ozone output of the original system, a stainless steel tank and piping and upgraded controls. (*See* ECF No. 277-20, at 48–52; ECF No. 283-26; ECF No. 283-27.)

experienced complete crop loss after the June 30, 2014 incident and reported that it would have an "ozone industry leader" visit the greenhouse to evaluate the system. (*Id.*) Defendant responded to Plaintiff the next day, advising that it had not denied Plaintiff's crop loss claim and that it was continuing to investigate what caused the over-sterilization issue. (*Id.* ¶ 52.) Defendant asked Plaintiff whether it had had a company evaluate the ozone system and whether it planned to share its report. (*Id.*) Receiving no response, Defendant followed up again with the same questions on August 27, 2014 and again on September 3, 2014. (*Id.* ¶¶ 53–54.) Then, on September 19, 2014, Defendant requested that Plaintiff submit a proof of loss statement within 60 days. (*Id.* ¶ 55.)

2. The Lanini Evaluation

On September 23, 2014, Don Lanini ("Lanini"), a sales representative from Pacific Ozone, an ozone system manufacturer, evaluated TRH's ozone system at Plaintiff's request while he was on a visit to TRH. (ECF No. 292 ¶ 54.) Lanini determined that the crop loss was caused by damage to the plants' roots and foliage resulting from either the fire, or the mechanical breakdown of the ORP controller and remote ambient ozone sensor, or some combination of both. (Pl.'s SMF ¶¶ 54–55.) Defendant notes and Plaintiff admits that Lanini is not an engineer but is instead a representative from the Pacific Ozone sales department, and that he had conducted the unpaid evaluation when he was at TRH trying to sell TRH a new ozone system. (*Id.* ¶ 54; ECF No. 292 ¶ 54.) Lanini later testified that he did not test or turn on the ORP controller because he was not familiar with it and that he could not determine whether it was damaged. (ECF No. 292 ¶ 55.) Lanini also testified that he declined to serve as an expert witness for Plaintiff. (*Id.* ¶ 145.)

On October 3, 2014, Plaintiff finally responded to Defendant's continued inquiries by requesting that Simpson evaluate the ozone system. (Def.'s SMF ¶ 57.) On October 6, 2014,

Defendant received correspondence from attorney Jeff Balicki, Esq., advising Defendant that he represented Plaintiff and requesting that Simpson inspect the system. (Pl.'s SMF ¶ 59.)

3. The Simpson Evaluation

On October 20, 2014, Simpson representatives Doug Cooper and Vitale Gringauz performed an inspection of the ozone system, one that representatives from Plaintiff and Defendant attended. (*Id.* ¶¶ 19, 51, 61, 64, 66–72; Def.'s SMF ¶ 59.) The Simpson representatives concluded and orally advised all present that the fire had been caused by water in the generator due to an incorrectly installed pipe and that the fire had damaged only the ozone generator. (Def.'s SMF ¶¶ 60–61.) Defendant acknowledges that Simpson's representatives were "unable to work with the ORP controller due to their lack of familiarity with it," and that the inspection of that component "remained open" after the visit. (ECF No. 280, at 7–8; Def.'s SMF ¶ 62.)

Plaintiff emphasizes that Simpson representative Gringauz testified that the "[o]nly way ozone can damage the plants is if they had an ozone leak in the air that was not noticed, or ozone control . . . ORP controller wasn't functioning properly . . ." (Pl.'s SMF ¶ 71.) Plaintiff also cites Gringauz's testimony that "damage to the plant was [sic] only could have happened from malfunction of the ozone controller, ORP controller…[t]he high ozone level in the water will only happen if you're not getting correct control from the controller." (*Id.* ¶ 72.) But Gringauz also testified, however, that it "would be impossible to rule out" whether the ORP controller mechanically failed or whether it failed because TRH personnel did not properly clean and calibrate it. (*Id.* ¶ 73.) On this point, Plaintiff maintains that it did regularly calibrate and clean ORP levels and argues that the failure must therefore have been mechanical. (*Id.* ¶ 26.) But because the ORP controller's condition remained undetermined and Simpson concluded that the fire did

not cause the crop loss, Defendant opened a separate, second equipment breakdown claim on October 28, 2014. (Def.'s SMF ¶ 65.)

Jones, the claim representative who attended the Simpson inspection on Defendant's behalf, offered Plaintiff $30,000 to settle all claims in person after that inspection (representing $26,000 for crop loss (the policy limit) and $4,000 for the ORP controller, and not counting the check in the amount of $7,341.85 that the Defendant had already issued for the ozone generator). (Pl.'s SMF ¶ 79.) Plaintiff alleges that Jones also apologized to Plaintiff for the way Florists handled the claim and expressed that he (Jones) wanted to try to resolve the case without Plaintiff's attorney. (*Id.* ¶ 77.)[4] Thomas Richey, Jones's supervisor, testified that he offered an additional sum to resolve the case, which TRH declined. (*Id.* ¶¶ 79, 81.) The parties agree that Richey emailed Plaintiff's counsel in October 2014, notifying Plaintiff that Florists would withdraw the settlement offer if Plaintiff did not accept it by 2:00 a.m. the next day. (*Id.* ¶ 82; ECF No. 292 ¶ 82.) Plaintiff characterizes this as a "threat"; Defendant calls it a deadline. Plaintiff did not accept the offer. (Pl.'s SMF ¶ 82; ECF No. 292 ¶ 82.)

Defendant acknowledges that Jones made the offer to settle the claim "to avoid litigation," arguing that, combined with the previous payment for the ozone generator, this amount would have covered "everything that [Plaintiff] now admits they were owed." (ECF No. 292 ¶ 79.) Defendant generally denies that the settlement discussions are material to the Motions now before the Court and asserts that they are also inadmissible under Federal Rule of Evidence 408, which

---

[4] Plaintiff asserted that Jones did not memorialize his offer in claims notes or confirm the offer in writing to Plaintiff, (Pl.'s SMF ¶ 80); Defendant clarifies and the record confirms that claim notes do reflect that Jones made an offer on October 22, 2014, (ECF No. 292 ¶ 80).

prohibits the use of evidence of attempts to settle a claim and conduct or statements made during those settlement negotiations to prove a disputed claim's validity or amount. (*Id.* ¶ 81.)

After requesting and receiving an extension from Defendant, Plaintiff submitted a First Sworn Statement in Proof of Loss on November 18, 2014, which claimed a loss amount of $1,397,779.05. (Def.'s SMF ¶¶ 67–69; Pl.'s SMF ¶ 97.) Defendant rejected that Statement because of various deficiencies with it, including the lack of a signature from TRH and its failure to provide supporting documentation and an adequate description of the claimed loss. (Def.'s SMF ¶ 70.) Defendant granted Plaintiff additional time to resubmit the proof of loss. (*Id.*) On December 16, 2014, Plaintiff submitted a Second Sworn Statement in Proof of Loss, which listed losses in the amount of $45,112.68 for a replacement ozone system and crop loss in the amount of $59,620 (representing the 22,000 lost plants at a cost of $2.71 each) for a total amount of $104,732.68. (*Id.* ¶ 71.)[5] Plaintiff attached four consultant reports in support of the claim.[6]

### 4.   The Short Evaluation

In late November 2014, Defendant hired greenhouse engineer Gregg Short ("Short") to investigate the ORP controller. (*Id.* ¶ 74.) Short is a licensed professional engineer specializing in greenhouse design and engineering with experience in irrigation and water treatment systems in

---

[5] Both the First and Second Sworn Statements in Proof of Loss contained the same figures of $45,112.68 for the replacement ozone system and $59,620 for the crop loss. (ECF Nos. 283-23, at 4; 283-25, at 8.) The First Sworn Statement in Proof of Loss, however, contained an additional $1,293,046.37, including losses of loans, grants, and investments. (ECF No. 283-23, at 4.) The Second Sworn Statement in Proof of Loss omitted these additional losses and instead included the following disclaimer: "'*TBD' The Named Insured has sustained other economic damages caused by [Florists'] handling of this claim that are not covered by Policy No. BP-13221. The Name Insured reserves its right to bring an action for those damages.*" (ECF No. 283-25, at 8.)

[6] The reports are: (1) November 17, 2014 Report by Don Lanini of Pacific Ozone; (2) Undated Letter Report by Thomas Graham, Ph.D., of Space Life Sciences Laboratory; (3) July 11, 2014 Letter Report by Sara R. May, Coordinator, Penn State Plant Disease Clinic; and (4) August 7, 2014 Letter Report by Krystal Snyder, Technical Specialist, JR Peters, Inc. (*Id.*)

greenhouses. (*Id.* ¶¶ 75–76.) Plaintiff attacks Short's qualifications, arguing that it was Short's first experience with an ozone generator, that he had no experience with Plaintiff's ORP controller, and that he was not an expert on ozone systems. (Pl.'s SMF ¶ 106.) Defendant responds by arguing that Short had extensive experience working with ORP controllers in greenhouses and that he had training on different disinfection systems as part of his continuing education classes; Defendant also notes that Plaintiff itself had listed Short as a technical consultant in its original business plan in 2011. (Def.'s SMF ¶¶ 76–77; ECF No. 292 ¶ 106.)

Short did not conduct his first evaluation until July 24, 2015. (Def.'s SMF ¶ 85.)[7] Representatives from Plaintiff, Defendant, and HSB attended Short's evaluation. (*Id.* ¶ 86.) Short concluded that the ozone generator was the only component of the ozone system that was damaged in the June 30, 2014 fire incident, including by demonstrating to all present that the ORP controller and oxygen concentrator functioned. (*Id.* ¶ 87.) Short's report noted that although a mechanical breakdown of the system's controller could cause excess ozone delivery, he did not observe any evidence during his investigation indicating that a mechanical breakdown of the controller had occurred. (*Id.*) Short concluded that the ORP controller was in working condition. (*Id.*) He also concluded that there were design and TRH installation issues with the ozone system, including the placement of the ORP sensor, that could have caused excessive ozone before the fire. (*Id.*)

---

[7] Each party blames the other for the delay, but Defendant's Statement of Material Facts alleges and Plaintiff admits the following: Short first requested to schedule an inspection December 12, 2014; Plaintiff's counsel advised that it could not schedule an inspection until after January 1, 2015; and Defendant informed counsel on January 5, 2015 that it would require additional investigation, including onsite inspection, to evaluate Plaintiff's consultant's report which had been submitted as part of Plaintiff's Second Sworn Statement in Proof of Loss. (*Id.* ¶¶ 78–80.) On January 13, 2015, Defendant learned that Plaintiff's counsel had resigned. (*Id.* ¶ 81.) Defendant tried to contact Plaintiff through letters sent in February, March, and April of 2015, that received no response. (*Id.* ¶¶ 82–83.) Defendant eventually received a May 4, 2015 letter advising that Plaintiff had obtained new representation, and the parties scheduled Short's inspection for July 24, 2015, almost eight months after Plaintiff was first asked to permit Short's inspection. (*Id.* ¶¶ 84–85.)

To confirm Short's findings, Defendant requested that Short perform a closed-system test of the ozone system with a new ozone generator that Defendant provided. (*Id.* ¶¶ 88–89.) Short conducted this test and videotaped it on November 3, 2015. (*Id.* ¶ 89.) Short found that the replaceable ORP sensor, a part which Short's report and the ORP controller manual both indicate requires regular replacement, was dried out and he replaced it. (*Id.* ¶ 90; ECF No. 277-21, at 11.) With the new sensor, the ORP controller then passed internal startup checks and the ORP controller functioned successfully with the new ozone generator in place—including powering up, passing internal diagnostics, and displaying a "millivolt" (mV) reading. (Def.'s SMF ¶ 90.) Importantly, the ozone system shut off automatically when the sensor registered a mV reading of 830, as it was programmed to do during the test. (*Id.*) During the test, Short also determined that the controller's set point was found to be at a much higher than recommended level for hydroponic growing systems, which could have explained TRH's issues with airborne ozone levels. (*Id.*)[8]

Plaintiff acknowledges that Short "was able to get the oxygen concentrator to run," but still contends that "he did not verify proper oxygen concentration levels to confirm that it was operating as intended or as it was functioning prior to the June 30, 2014 explosion/fire." (ECF No. 290, at 15.)

### D. **Claim Denial**

On December 18, 2015, Defendant denied Plaintiff's crop loss claim based on its determination that it had found no evidence of such a loss caused by or resulting from an "Accident" to "covered equipment" under the Policy's Equipment Breakdown endorsement. (Pl.'s

---

[8] Short was not able to determine whether that setpoint was the level being used by TRH for growing or if it was later changed following the crop loss but opined that "[a]ssuming that the higher level was actually used during growing operations, it would have been at a level sufficient to cause substantial crop damage." (*Id.*)

SMF ¶ 130.) Defendant reiterated that its experts found no evidence of direct physical loss in the form of mechanical breakdown independent of the June 30, 2014 fire and explosion incident, and reissued a $7,341.85 payment for replacement of the ozone generator. (*Id.* ¶¶ 129–30.)

Plaintiff now argues that a mechanical breakdown of either the system's ORP sensor, ORP controller, or both caused the over-ozonation of the water and ultimate crop loss. (Def.'s SMF ¶ 96; ECF No. 285-5 ¶ 3.) Defendant continues to maintain that Plaintiff has failed to come forward with sufficient admissible evidence establishing that any equipment beyond the ozone generator had sustained damage. (ECF No. 291, at 2.)

## II.   <u>DISCUSSION</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *Boyle v. Cnty. of Allegheny,* 139 F.3d 386, 393 (3d Cir. 1998). Instead, the court must consider the evidence and all reasonable inferences which may be drawn from it in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). When a party with the burden of proof fails to produce sufficient evidence to prove their claim, summary judgment may be granted. *Saldana v. K-Mart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). And when the non-moving party bears the burden of

proof on an issue, it may not merely rely on the allegations in its pleadings to survive summary judgment but must set forth sufficient facts showing that there is a genuine issue for trial. *Id.*

Count I of the Amended Complaint alleges that Defendant breached the Policy by violating express duties and the implied duty of good faith and fair dealing. Count III alleges that Defendant's handling and denial of Plaintiffs' claim for coverage violated Pennsylvania's insurance bad-faith statute, 42 Pa. Cons. Stat. § 8371. Plaintiff moves for summary judgment on its breach of contract claim and for partial summary judgment on its bad faith claim, "leaving only a dispute as to the extent of Three Rivers' common law and statutory bad faith damages." (ECF No. 274 ¶ 7.) Defendant moves for summary judgment on Plaintiff's remaining breach of contract and bad faith claims, including on Plaintiff's claim for consequential damages for breach of contract associated with business loss. (ECF No. 279, at 1.) In the alternative, Defendant moves for partial summary judgment on the claim for consequential damages for breach of contract associated with business loss. (*Id.*)

### A. **Breach of Contract Claim**

To maintain a breach of contract claim under Pennsylvania law,[9] a plaintiff must establish (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Hamm v. Allstate Prop. & Cas. Ins. Co.*, 908 F. Supp. 2d 656, 665 (W.D. Pa. 2012) (citing *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)). In an insurance coverage dispute, the insured bears the initial burden to make a prima facie showing that a claim falls within the policy's coverage. *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966); *Jacobs*

---

[9] Under Pennsylvania law, an insurance contract is governed by the law of the state in which it was created. *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 162 (3d Cir. 2011). The insureds are Pennsylvania residents, the loss occurred in Pennsylvania, and the policy was delivered in Pennsylvania; the parties do not dispute that Pennsylvania law applies. (ECF Nos. 278, at 10; 280, at 5 n.1.) The Court accordingly concludes that Pennsylvania law applies.

*Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365, 376 (3d Cir. 2001). If the insured meets that burden, the insurer then has the burden to establish that a policy exclusion excuses the insurer from providing coverage. *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 158 (3d Cir. 2017).

As a general matter, "policy exclusions are narrowly construed in favor of coverage, while coverage clauses are construed broadly 'so as to afford the greatest possible protection to the insured.'" *Griggs Rd., L.P. v. Selective Way Ins. Co. of America*, 368 F. Supp. 3d 799, 804 (M.D. Pa. 2019) (quoting *Eichelberger v. Warner*, 434 A.2d 747, 750 (Pa. Super. 1981)); *accord Mut. Benefit Ins. Co. v. Politspoulos*, 115 A.3d 844, 852 n.6 (Pa. 2015). But where an insured fails to carry its initial burden, the insured is not entitled to coverage and summary judgment for the insurer is appropriate. *See, e.g.*, *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593 (W.D. Pa. 2000), *aff'd*, 345 F.3d 190 (3d Cir. 2003); *Meridian Mut. Ins. Co. v. Continental Bus. Ctr.*, No. CIV.A. 04-1639, 2005 WL 856935 (E.D. Pa. Apr. 14, 2005), *aff'd*, 174 F. App'x 104 (3d Cir. 2006).

The parties do not dispute that the explosion or fire which occurred on June 30, 2014 was a covered "cause of loss;" they also agree, however, that the incident on that date did not damage TRH's crops. Plaintiff now instead argues that a mechanical breakdown of the system's ORP controller and/or ORP sensor occurred at some unspecified time before that explosion/fire, causing excess ozone to reach its crops and damage them. (ECF No. 290, at 9 ("The dispute concerns whether Three Rivers suffered the direct physical loss of its ORP controller and/or ORP sensor, oxygen generator and remote ambient ozone sensor due to mechanical breakdown.").) Plaintiff therefore argues that Defendant's ultimate December 2015 coverage denial "falsely claimed" that Defendant found no evidence of loss caused by an accident to covered equipment, and that

Defendant "falsely concluded" that there was no evidence of direct physical loss in the form of a mechanical breakdown independent of the fire. (ECF No. 278, at 17.)

The Court concludes that Plaintiff's breach of contract claim fails as a matter of law because Plaintiff has failed to produce admissible evidence from which a reasonable jury could find in its favor. Conversely, the Court also concludes that Defendant is entitled to summary judgment on this claim because Plaintiff has not produced any admissible evidence to establish beyond speculation that its crop failure resulted from a covered mechanical breakdown. At best, Plaintiff has demonstrated that there is some uncertainty about whether the original ORP sensor was working appropriately at the time of the crop loss, and if it was not, why it was failing to do so. But that uncertainty is not sufficient to carry Plaintiff's prima facie burden to demonstrate that there was a covered loss.

To meet its initial burden of making a prima facie case of coverage, Plaintiff must produce admissible evidence allowing a reasonable jury to conclude that (1) the ozone system's components failed to properly function, causing over-ozonation and crop failure; and (2) those components failed to function because of a malfunction or "mechanical breakdown"— not because of an uncovered cause, such as user error. Plaintiff argues that it has produced evidence establishing that a covered mechanical breakdown of the ozone system's components occurred— pointing to various comments and notes that it argues show that Lanini, Graf, and Gringauz *could not rule out* the possibility of controller failure as a possible over-ozonation cause; and criticizing

the testing methods that Short used in the evaluation *that did rule out* the possibility of controller failure to a reasonable certainty.[10]

In sum, Plaintiff points to various items in the record that it argues show that Defendant knew that controller failure *can* cause over-ozonation or that it argues raise doubts about Defendant's investigators' methods. Plaintiff's theory of this claim thus rests on the idea that Defendant has failed to produce proof that a covered accident *did not* occur to Plaintiff's equipment, and that Defendant could not rule out that such an accident occurred. (Pl.'s SMF ¶ 133.) But this argument mischaracterizes Plaintiff's burden of proof. Defendant does not have the initial burden to prove that a mechanical breakdown *did not* occur—instead, Plaintiff has the burden of making an affirmative prima facie case that an "Accident" to covered equipment caused its crop loss. (*See* ECF No. 292 ¶ 133; Def.'s SMF ¶¶ 97–99.) The Court concludes that here, Plaintiff has failed to do so.

First, Plaintiff has failed to introduce expert testimony supporting its argument that a covered accident occurred. Defendant argues and the Court agrees that expert testimony is required for Plaintiff to make a prima facie case on its highly technical claim that a covered accident occurred. (ECF No. 294, at 7.)

---

[10] For instance, Plaintiff emphasizes that Short admitted that an ORP controller mechanical breakdown "could" cause excess ozone delivery and argues that Short "refused to conclude or confirm 'that *no* sudden breakdown to sensor occurred.'" (ECF No. 278, at 17 (emphasis added).) Plaintiff similarly points McCullough's statements and opinion after the initial fire and explosion that the controller failed and the ORP controller "check sensor" photograph that McCullough submitted; a written note from Hogan stating Graf's impression that the crop loss "almost has to be due to faulty ORP sensor"; and communications from Jones to HSB advising that Simpson said the excessive ozone "was caused by a malfunctioning ORP Controller that they couldn't get out of the error mode." Finally, Plaintiff points to Lanini's opinion that the crop loss could have resulted from either the fire, a breakdown of the ORP controller, or a combination of both; Gringauz's inability to calibrate the ORP controller and opinion that crop loss could have resulted from ORP controller failure, among other causes; and TRH's history of proper ORP controller calibration. (*Id.* at 18– 19.)

The Third Circuit has explained that in general:

> [e]xpert evidence is not necessary . . . if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation.

*Oddi v. Ford Motor Co*., 234 F.3d 136, 159 (3d Cir. 2000) (alteration in original) (quoting *Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 415–16 (3d Cir. 1999)).

In contrast, expert testimony generally *is* required in cases involving a product's alleged defect or failure, "unless the issues are 'simple' and 'within the range of comprehension of the average juror.'" *Westfield Ins. v. Detroit Diesel Corp.*, No. 3:10-CV-100, 2012 WL 1611311, at *3 (W.D. Pa. May 8, 2012) (quoting *Oddi*, 234 F.3d at 159). Thus, courts routinely require plaintiffs to support their claims with expert testimony when the subject matter is highly technical and beyond the jury's understanding. *See, e.g.*, *Oddi,* 234 F.3d at 159. For instance, in *Detroit Diesel Corp.*, the Court held that the plaintiff was required to produce expert evidence supporting its claim that a defective bus engine or component turbocharger caused a fire, because "[t]he inner workings of the engine and its components [were] highly technical." 2012 WL 1611311, at *4.

Here, the Court concludes that the question of whether a covered mechanical breakdown of the ozone system equipment occurred is such a "highly technical" matter. Plaintiff's own arguments point to the complexity of that issue and of this case more broadly: Plaintiff criticized Defendant's decision to retain both Graf and Short because they did not have specific experience with the type of ozone system at issue, even though they were, respectively, an electrical engineer and a greenhouse engineer. (ECF No. 294, at 9.) And the record of the claims administration

process generally shows that multiple examinations by highly qualified engineers were required to make an ultimate determination about the cause of the crop loss.

The Court therefore concludes that the issues here are neither "simple" nor "within the range of comprehension of the average juror." *Detroit Diesel Corp.*, 2012 WL 1611311, at *3. Like in *Detroit Diesel Corp.*, without technical expert testimony in this case, a jury would simply be forced to impermissibly speculate about whether and how a mechanical breakdown occurred, whether and if so, how such a breakdown led to a covered "[a]ccident," and what damage the accident caused. Expert testimony is therefore required to make out a prima facie claim of coverage here.

Indeed, Plaintiff does not argue that it need not produce expert testimony on these questions. Instead, Plaintiff proposes that Gringauz, one of the Simpson investigators hired by Defendant, is "a hybrid fact and a non-retained expert witness." (ECF No. 297, at 5.) According to our Court of Appeals, a lay witness with first-hand knowledge may offer an opinion akin to expert testimony where "the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion." *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 356 (3d Cir. 1998) (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201–02 (3d Cir. 1995)). Plaintiff argues that Gringauz has such relevant knowledge and experience based on his "over 25 years of experience in the design, manufacturing, installation, commissioning and customer support of complex electro-mechanical systems and sub-systems" and specific experience with ozone treatment systems. (ECF No. 297, at 6 n.6.) Plaintiff therefore proposes that "[a]t the moment Gringauz confirmed his crop loss causation opinion under oath Three Rivers met its burden to show that its ORP controller failed to function properly constituting

20

a 'mechanical breakdown' under both the Policy and Pennsylvania law, resulting in crop loss . . . ." (*Id.* at 5.)

The Court disagrees. Even if the Court determined that Gringauz were qualified to serve as a "hybrid fact and a non-retained expert witness," a role not referenced anywhere in Fed. R. Evid. 701 or 702; and even if the Court determined that such opinion testimony of such a non-expert witness, on a technical matter far beyond the express limitations of Fed. R. Evid. 701(c), satisfied the requirement that Plaintiff produce expert testimony in support of its claim, the content of Gringauz's testimony is insufficient to support Plaintiff's argument.

Gringauz did testify that high ozone levels "will only happen if you're not getting correct control from the controller." (ECF No. 297, at 5.) However, he also testified that (1) the controller's failure *could* be caused by the actions or lack of action by an owner/operator and that (2) the error reading on the controller *could* indicate a number of things or *"can be anything."* (ECF No. 292 ¶¶ 70–71 (emphasis added).) And most importantly, Gringauz ultimately testified that he did not know "the precise cause" of any controller failure that did occur. (ECF 290, at 24.) This statement demonstrates the fundamental limitation of Plaintiff's argument that Gringauz "was reasonably certain" that a controller failure caused the crop loss. (ECF No. 290, at 24.) Gringauz's testimony simply is not "reasonably certain" as to this issue of causation, especially given his use of the phrase "*can be anything*". The fact that Gringauz was "reasonably certain" that a controller failure caused the crop loss, without more, says nothing about whether the *reason* the controller failed (if it did) was a covered cause of loss, namely an accident to covered equipment.

In other words, even if Gringauz's testimony did show to some reasonable degree of certainty that a failure of the ORP controller caused the crop loss, it would still be insufficient to

support Plaintiff's claim that a *covered* cause of loss occurred. Gringauz testified that he "did not know" why the controller would have failed, stating that, if the controller did fail, it would be "impossible to rule out" whether it mechanically failed or whether it failed because TRH personnel did not keep it properly cleaned and calibrated. (Pl.'s SMF ¶ 73.)[11]

Gringauz's testimony is therefore inconclusive and speculative on the question of whether the controller failed and most critically, on the question of if it did why it did. It is therefore not "reasonably certain" at all with respect to the question of whether, if the controller failed, it failed due to a covered cause of loss. Given that it is Plaintiff's burden to show that a mechanical breakdown occurred that could qualify as an "accident" to the controller, Gringauz's testimony is simply insufficient to make out the prima facie case for coverage.

The Court concludes that Plaintiff has failed to produce expert testimony on a question that is beyond a reasonable juror's comprehension. Over the course of the claims investigation process and six years of litigation—and importantly, in the record before the Court—Plaintiff has produced no admissible expert testimony establishing damage to equipment beyond the ozone generator, besides the proffered expert testimony that the Court previously excluded as unreliable. (ECF Nos. 250, 251.)[12] As discussed below, the best Plaintiff can do is suggest the possibility that the existing ORP sensor failed to accurately communicate with the ORP controller for *some reason*.

---

[11] Plaintiff's bare assertion that it "regularly calibrated ORP levels and monitored ozone daily," (Pl.'s SMF ¶ 26), without more, is not sufficient to supply the requisite level of certainty, as TRH employees have not been shown to be qualified to offer an expert opinion as to the cause of any potential controller failure and the record does not establish that Gringauz considered these assertions in formulating his testimony. Indeed, Gringauz testified that he could not say based on his inspection whether "the failure between [sic] communication from the [sensor] to the controller was either lack of maintenance versus any other type of defect." (ECF No. 277-15, at 48–49.)

[12] Notably, Plaintiff failed to inform its proposed expert, engineer Mr. Greenway, that the ozone system remained available for inspection; accordingly, Mr. Greenway never tested or inspected the system. The Court excluded Mr. Greenway's testimony as unreliable by Order and Opinion at ECF Nos. 250 and 251.

That is insufficient to fulfill Plaintiff's initial burden, as summary judgment is properly entered against a non-moving party when that party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, Plaintiff has failed to carry its burden of making out a prima facie case of coverage as required to sustain its breach of contract claim.

This conclusion is supported by the inconclusive nature of the other evidence that Plaintiff offers in support of its argument. First, to the extent that Plaintiff relies on Lanini's opinion that the crop loss could have resulted from a controller breakdown, that opinion is undercut by his lack of qualification to render that opinion and his equivocal deposition testimony. Lanini was an ozone system sales representative, not an engineer, and conducted his evaluation of the system for free as part of an attempt to sell Plaintiff a new ozone system. (ECF No. 292 ¶ 54.) Lanini admitted that he did not test or turn on the ORP controller because he was not familiar with it and could not determine whether it had been damaged, and ultimately declined to serve as an expert witness for Plaintiff. (*Id.* ¶¶ 141–45.) Because of his lack of qualification, the Court concludes that Lanini's opinion is simply not probative on the question of whether a covered mechanical breakdown occurred.

Second, Plaintiff points to its self-described history of proper controller calibration as evidence that any controller breakdown that did occur is attributable to a covered mechanical breakdown—and not an uncovered cause, such as operator error. (*See* Pl.'s SMF ¶ 26.) But Plaintiff has not produced sufficient evidence that the controller failed at all. During Short's July 2015 test, the controller powered up, passed internal diagnostics, and registered a millivolt reading.

(Def.'s SMF ¶ 87.) From this result, Short concluded that the ORP controller was in working condition. (*Id.*) As such, the admissible expert testimony now in the record indicates that the ORP controller did not experience an accident to covered equipment, rather than supporting the Plaintiff's position that it did.

Although Plaintiff contests Short's methods and conclusions, it does so without the support of any citation to supporting evidence or expert testimony. In particular, Plaintiff argues that Short had to replace TRH's existing ORP sensor and calibrate the replacement sensor before successfully regulating ozone production and argues that, because Defendant did not test the relay between the *original* sensor[13] and the controller, Short did not establish that the controller was capable of properly regulating ozone production. (Pl.'s SMF ¶ 127.) But Plaintiff points to no expert reports, engineering manuals, or other evidentiary materials supporting the argument that a test using a replacement sensor was incapable of accurately measuring the controller's functionality.

Moreover, even crediting Plaintiff's argument that Short's test was unable to verify the relay between the original sensor and the controller, that argument only creates the possibility that for some reason, the original sensor was not functioning correctly at the time of Short's test, more than a year after both the fire and the beginning of TRH's crop loss issues. Short's report indicates that the sensor was dried out at the time of his test, and that ORP "sensors are field replacement items and prone to failure when dried out." (Def.'s SMF ¶ 90.) And even assuming Plaintiff was having issues with the sensor at the time of the crop loss, as is suggested by McCullough's report in July of 2014 that the ORP controller showed a "check sensor" reading, (ECF No. 278, at 13;

---

[13] The Court uses "original" to refer to the sensor that was replaced at the time of Short's closed-circuit test on November 3, 2015, which the record indicates was in use at the time of the crop loss. It is not clear whether that sensor was itself the one that Plaintiff originally obtained with its ORP system.

Pl.'s SMF ¶ 35), that does not indicate that any hypothetical failure by the controller to properly regulate ozone as a result of issues with the sensor was a covered cause of loss. Here's why.

First, the Court concludes that McCullough's lay opinion cannot serve as a factual basis to support a finding that the ORP controller suffered a mechanical breakdown. And the admissible expert testimony instead indicates that the check sensor reading is not conclusive evidence of controller failure. (ECF No. 292 ¶ 68 (citing Gringauz's testimony that the error code can "be physical, electrical, like broken wire, or it can be issue with the programing of the controller or memory, or *can be anything*") (emphasis added).) Gringauz's testimony is supported by the ORP controller manual, which indicates that when the controller displays a "check sensor" error, it should be troubleshooted by (1) checking the wiring and contacts, (2) verifying the sensor is securely installed, and (3) replacing the sensor. (ECF No. 277-21, at 11.) As Plaintiff explains in its own briefing, "the mere possibility that something occurred in a particular way is not enough, as a matter of law for a jury to find it probably happened that way." (ECF No. 290, at 24–25 (quoting *Saldana v. Kmart Corp.*, 260 F.3d 228, 234 (3d Cir. 2001)).) Even construing the evidence in the light most favorable to Plaintiff, Plaintiff's bare rejection of Defendant's evidentiarily-supported conclusion that the ORP controller functioned when Short tested it cannot carry Plaintiff's burden.[14]

---

[14] Plaintiff also argues that Short's report "admitted that a mechanical breakdown of the ORP controller could result in excess ozone" delivery to the plants. (ECF No. 278, at 17.) But the record evidence Plaintiff cites for this proposition does not support its characterization of Short's report. Short in fact opined as follows: "While a mechanical breakdown of the ORP controller could result in excess ozone delivered to the plant roots, [that] would be a separate event from the fire," and that, regardless, the investigation "did not observe any indication of" such a mechanical breakdown. (Def.'s SMF ¶ 87.) Placed in its full context, the proffered quote from Short's report simply shows that Short found no evidence indicating that a mechanical breakdown occurred.

Plaintiff's other arguments are similarly unavailing. Plaintiff first points to a note made by HSB representative Mark Hogan ("Hogan") during a phone call with Graf reflecting that the crop loss "almost has to be [due to a] faulty ORP sensor." (Pl.'s SMF ¶ 49.) But Hogan testified that the referenced portion of the written document was purely speculative—and that Graf, who examined the system, indicated that he did not know the cause of the excessive ozone. (ECF Nos. 277-8, at 25–27; 292 ¶ 49.) Plaintiff also points to a note that Hogan made either during or after a call with Jones reflecting that the Simpson representatives communicated that the excessive ozone "was caused by a malfunctioning ORP Controller that they couldn't get out of the error mode." (ECF No. 297, at 20; Pl.'s SMF ¶ 83.) Reiterating that Simpson believed that controller failure was a possibility, Plaintiff again rests on the argument that "Simpson never determined that there was no evidence of direct physical loss to the components of Three Rivers' ozone system beyond the ozone generator." (ECF No. 290, at 14.) But even if Simpson's investigators believed controller failure *could* be a possible cause of the over-ozonation, this argument also fails to fulfill Plaintiff's prima facie burden to come forward with evidence sufficient to establish a covered cause of loss.

In *Hayden v. Westfield Ins. Co.*, this Court granted summary judgment to an insurer on a breach of contract claim based on denial of coverage for interior water damage to a home, determining that the insured had failed to come forward with competent evidence establishing that a storm caused damage to the home's interior. No. CIV.A. 12-0390, 2013 WL 5781121 (W.D. Pa. Oct. 25, 2013). After finding that the report of the insured's engineering expert was not competent, the Court concluded that even if the expert report were admissible, it would be insufficient to create a genuine issue of material fact that the insurer breached the contract because that report was inconclusive about whether the storm caused interior damage to the home. *Id.* at *7–8. The Court

held that the expert's testimony that "[he] could not tell the exact source of the infiltration" undermined his report's conclusion that the infiltration was due to storm water damage. *Id.* at *7.

Similarly, to the extent that Hogan's notes reflect that Simpson's investigators considered controller failure one possibility for the crop loss, the notes are inconclusive—they were not made by an expert, do not represent an expert's formal opinion or conclusion, and do not pinpoint a mechanical breakdown of the controller as the most likely crop loss cause. Those notes are therefore insufficient to establish a genuine issue of material fact that Defendant breached the Policy.

Finally, to the extent Plaintiff raises arguments related to Jones's representations surrounding and relating to the October 2014 settlement offer, the Court concludes that those discussions are inadmissible under Federal Rule of Evidence 408, which prohibits the use of evidence of attempts to settle a claim and conduct or statements made during settlement negotiations to prove the validity or amount of a disputed claim. Fed. R. Evid. 408(a); *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir. 1995). Because Plaintiff attempts to point to Jones's offer and accompanying statements as evidence of its claim's validity, the Court concludes that this evidence is inadmissible and cannot be considered here.[15]

---

[15] The Third Circuit has held that "the meaning of 'dispute' as employed in the rule includes both litigation and less formal stages of a dispute," as occurred throughout the claims investigation process here. *Affiliated Mfrs.*, 56 F.3d at 528. In particular, the dispute need not progress to the point where the threat of litigation has crystalized; "a mere difference of opinion will suffice." *ECEM Eur. Chem. Mktg. B.V. v. Purolite Co.*, 451 F. App'x 73 (3d Cir. 2011) (citing *Id.* at 527). The Court notes, however, that in this case, Jones made the offer in response to the threat of litigation, after Defendant received correspondence from Plaintiff's attorney Jeff Balicki. (ECF No. 292 ¶ 79; Pl's SMF ¶¶ 59, 77–79.)

While Plaintiff fails to point to sufficient evidence showing that a mechanical breakdown occurred, Defendant instead points to record evidence tending to show that (1) the controller functioned properly, and that (2) TRH's own actions caused the over-ozonation and crop loss.

First, despite various investigators' speculation on possible causes, all three evaluators ultimately and formally concluded that the ozone generator was the only component that sustained damage related to the June 2014 fire incident and that the other components remained functional. First, Graf's August 2014 report concluded that only the ozone generator sustained damage and reported that there was no visible fire damage to any other system component. (Def.'s SMF ¶ 37.) Then, Simpson concluded that fire damage was limited to the ozone generator and no other system components sustained damage. (*Id.* ¶ 61.) Finally, Short's test with the new generator showed that the system successfully produced—and the ORP controller successfully regulated—concentrated oxygen and ozone, demonstrating that the generator was the only damaged component, and the rest of the system was functional when it was replaced. (*Id.* ¶¶ 87–90.) To the extent that prior evaluators had speculated about ORP controller failure as a possible cause of over-ozonation, Short's closed-circuit test ruled that cause out. (*Id.* ¶ 90.)[16]

And to the extent that over-ozonation of the water did harm the crops, Defendant has produced unrebutted record evidence indicating that TRH's actions caused that over-ozonation. During Graf's July 18, 2014 inspection, McCullough explained that *before* the fire, the sterilization system was already over-sterilizing the water for the hydroponic herbs. (*Id.* ¶ 37.) During Short's July 2015 inspection, he concluded that there were design and TRH installation issues with the

---

[16] As discussed above, any possible issues with the original ORP sensor are not to the contrary, because Plaintiff has failed to show that any hypothetical sensor failure resulted from a covered cause of loss.

ozone system that could have caused excessive ozone before the fire. (*Id.* ¶ 87.) And during the November 3, 2015 closed system test, Short found that the controller's set point was found to be at a higher than recommended level for hydroponic growing systems, which would have explained TRH's issues with airborne ozone levels. (*Id.* ¶ 90.)

McCullough's own testimony establishes that Plaintiff intentionally allowed ozone to reach the plants themselves. (*Id.* ¶ 104; ECF No. 283-4, at 15.) And Plaintiff's own crop damages expert, Thomas Graham ("Graham"), admitted that the damage to basil plants he observed was consistent with intentionally allowing ozone to reach the plants. (Def.'s SMF ¶¶ 104, 116, 121.) This evidence supports Defendant's argument that either TRH intentionally allowed ozone to reach the plants which damaged them; or that TRH improperly installed or controlled the system, which allowed ozone to reach the plants and damage them. (ECF No. 280, at 3.)

The undisputed record accordingly provides no admissible evidence that the controller failed due to a covered cause but instead does demonstrate that Plaintiff's own practices may well have damaged the plants. The Court therefore concludes that, considering the record evidence and drawing all reasonable inferences which may be drawn from it in the light most favorable to the Plaintiff, there is no genuine issue of material fact on the breach of contract claim. Plaintiff has failed to carry its burden of coming forward with admissible evidence sufficient to establish a prima facie case of coverage, and Defendant is entitled to judgment as a matter of law on Plaintiff's breach of contract claim.

B. <u>**Bad Faith Claim**</u>

Both parties also move for summary judgment on Plaintiff's bad faith claim. To recover in a bad-faith action under Pennsylvania law, the plaintiff-insured must prove by clear and convincing evidence "(1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005). "The first prong of the [bad faith] test is objective, 'so if a reasonable basis exists for an insurer's decision, even if the insurer did not rely on that reason, there cannot' as a matter of law be bad faith." *Hamm v. Allstate Prop. & Cas. Ins. Co*, 908 F. Supp. 2d 656, 669 (W.D. Pa. 2012) (quoting *Babayan*, 430 F.3d at 137); *see also J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004). The second part of the bad faith test is subjective, requiring proof of an insurance company's intent or recklessness to mistreat the policyholder. *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 376 (Pa. 2017). Mere mistake, misjudgment, or negligence does not rise to the level of bad faith under Pa. Cons. Stat. § 8371. *See, e.g.*, *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F. Supp. 709, 713–14 (M.D. Pa. 1995).

A plaintiff must establish a bad faith claim by clear and convincing evidence. *Cowden v. Aetna Cas. & Sur. Co*., 134 A.2d 223, 229 (Pa. 1957); *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015). That standard requires that the plaintiff show that the evidence is so "clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Hayden v. Westfield Ins. Co.*, 2013 WL 5781121 at *30 (W.D. Pa. Oct. 25, 2013) (quoting *Pilosi*, 393 F.3d at 367). "Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive

evidentiary burden at trial." *Id.*, at *11 (quoting *Pilosi*, 393 F.3d at 367); *accord Swan Caterers, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. 12-CV-00024, 2012 WL 5508371, at *6 (E.D. Pa. Nov. 13, 2012). Bad faith cases are accordingly commonly decided at the summary judgment stage, with the court determining that an insurer had a reasonable basis for its actions. *Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578, 581 n.3 (E.D. Pa. 1998).

Here, Plaintiff points to facts in the record that fall far short of the "clear, weighty, and convincing" evidence required to meet its burden. Plaintiff argues that Defendant unreasonably denied Plaintiff's claims; that it acted in bad faith by hiring unqualified experts; that it concealed consultants' findings; and that it acted in bad faith by failing to "split" the crop loss from the equipment damage claim. As described below, the Court concludes that some of these assertions are unsupported by the record, and the balance of the assertions that the record conceivably might support cannot meet Plaintiff's heavy burden to establish bad faith.

1. Defendant Reasonably Denied Plaintiff's Claims

The Court concludes that Defendant is entitled to judgment as a matter of law on the bad faith claim. First, where no coverage exists under an insurance policy, the insurer cannot be found to have acted in bad faith for having denied coverage. *See USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 202 (3d Cir. 2006) (determining that a "bad faith claim necessarily fails in light of our determination that [the insurer] correctly concluded that there was no potential coverage under the policy"); *631 N. Broad St., LP v. Commonwealth Land Title Ins. Co.*, 778 F. App'x. 164, 166 (3d Cir. 2019).

Beyond that, for the reasons described at length above, the Court concludes that Defendant had a reasonable basis for its actions in denying Plaintiff's claim as a matter of law: it is undisputed

that Defendant quickly investigated Plaintiff's claim for crop loss and mechanical breakdown; it did so by retaining experts with increasingly greater and greater degrees of specialized experience and in response to Plaintiff's various disagreements with those experts' conclusions; and it ultimately accepted Short's report and conclusion that no covered mechanical breakdown occurred, paid out the claim for the replacement generator that the Policy did cover, and promptly adjudicated Plaintiff's mechanical breakdown and crop loss claims.

The Court has determined that Defendant's policy position was correct as a legal matter. But even where an insurer's coverage position is ultimately incorrect, "an insurance company's substantial, thorough investigation, based upon which the insurance company refuses to make or continue benefit payments, establishes a reasonable basis that defeats a bad faith claim." *Cantor v. Equitable Life Assurance Soc'y of U.S.*, No. CIV. A. 97-CV-5711, 1999 WL 219786, at *3 (E.D. Pa. Apr. 12, 1999) (collecting cases). Defendant conducted a substantial, thorough, and timely investigation here as a matter of law. Defendant appropriately and timely responded to Plaintiff's claim in July 2014, quickly conducted an initial investigation by sending an explosion investigator to respond to a claim describing a fire and/or explosion, and then retained an electrical engineer to evaluate the ozone system. Based on that engineer's opinion that the ozone generator had been damaged, Defendant promptly issued a check for a replacement ozone generator in the amount of a quote prepared by that ozone system's manufacturer while continuing to investigate the crop loss claim to determine what caused the over-sterilization issue. When Plaintiff rejected that payment and requested further testing, Defendant acceded, hiring another company to conduct additional testing. And finally, when that company was unable to test the controller, Defendant sent a third investigator who, despite Plaintiff's months-long delay in permitting that investigator to access the

equipment, ultimately was allowed by Plaintiff to conduct a test of the ozone system that showed that the controller functioned appropriately.

Courts have repeatedly held that "an insurer's reasonable reliance on an engineering expert's report for a coverage decision does not constitute bad faith." *Hamm*, 908 F. Supp. 2d at 673; *see also El Bor Corp. v. Fireman's Fund Ins. Co.*, 787 F. Supp. 2d 341, 349 (E.D. Pa. 2011) (insurer's reliance on engineer's findings "provide[d] reasonable grounds to deny benefits"); *Gethsemane FBH Church of God v. Nationwide Ins. Co.*, No. CV 19-03677, 2020 WL 1694544, at *4 (E.D. Pa. Apr. 7, 2020) ("Insurance companies act reasonably, and do not exercise bad faith, when they deny claims based upon engineering experts' reports."). Short's conclusion that there was no evidence of a mechanical breakdown of the ORP controller resulting in crop loss was unrebutted by Plaintiff, and Defendant acted reasonably by relying on the report of a qualified expert who was able to demonstrate the system's functionality.

Therefore, because Defendant facially acted reasonably and correctly in denying Plaintiff's claims, the bad faith claim fails as a matter of law. An evaluation of Plaintiff's remaining arguments in support of those bad faith claims supports the Court's conclusion that Defendant's bad faith claim fails, as Plaintiff's remaining arguments are either factually unsupported by the record or, while perhaps factually supported, fail to rise to the level of "clear and convincing" evidence of bad faith.

2. <u>Defendant Reasonably Evaluated the Ozone System</u>

Plaintiff argues that Defendant acted in bad faith in retaining Donan and Simpson, who it argues were respectively not qualified to assess the ozone system and did not appropriately assess the system. (*See* ECF No. 278, at 24–25.) The Court concludes that these arguments are unsupported by the record. First, Donan was a national engineering firm that Defendant had used

in the past for investigations. (Def.'s SMF ¶ 29.) In response to Plaintiff's report that an explosion/fire had occurred, Donan acted reasonably by sending Landis, a certified fire and explosion investigator, to conduct a site visit. (*Id.* ¶ 30.) When Landis recommended that Defendant retain an electrical engineer to determine the cause of loss, Defendant quickly followed that recommendation by sending Donan's electrical engineer, Graf. (*Id.* ¶¶ 31, 35.)

Plaintiff argues that Defendant acted in bad faith by retaining Graf because he did not have specific experience evaluating ozone systems and further argues that Graf concluded "without basis" that the high concentration of ozone resulted from causes which would exclude coverage. (Pl.'s SMF ¶¶ 42, 47–48.) But Plaintiff has never pointed to evidence that Graf's opinions were incorrect. Graf concluded that although there were multiple potential causes of the over-ozonation, the high ozone concentrations "occurred before the ozone generator failed" and not as a result of the failed generator. (Def.'s SMF ¶ 37.) Additional experts have only confirmed this. Regardless, Defendant did not deny any of Plaintiff's claims based on Graf's opinion. Instead, it issued an immediate payment to replace the damaged ozone generator, then hired investigators with more specialized qualifications to continue the investigation into the causes of the crop loss. (*Id.* ¶¶ 47–48.)

Plaintiff also critiques the Simpson evaluation, arguing Defendant acted in bad faith by failing to obtain a written report from Simpson and by promising that Simpson would inspect the ORP and "get [it] running," but failing to ensure that Simpson did so. (ECF No. 278, at 24.)[17] But Simpson representatives made an oral report of their findings to both Plaintiff and Defendant at

---

[17] Plaintiff does not directly criticize Simpson's qualifications. This is appropriate: Simpson, as the system's original manufacturer and a consultant on Plaintiff's original business plan, appears to the Court to have been well qualified to evaluate the system, and Plaintiff's own actions confirmed that.

the evaluation site on October 20, 2014. (Def.'s SMF ¶ 59–63.)[18] Accordingly, Plaintiff's argument that Defendant "conceal[ed] its agents' favorable coverage impressions from Three Rivers" by failing to obtain a written report from Simpson is misplaced. (ECF No. 278, at 6.) Simpson made Plaintiff aware of its findings on the day it made them. Defendant's decision that no written report was necessary could not reasonably be found to be an unreasonable one.

Second, Plaintiff argues that Defendant acted in bad faith by reneging on a "promise" to Plaintiff to have Simpson replace its ozone generator. In support of this argument, Plaintiff points to an email exchange between Plaintiff's and Simpson's representatives and Jones about whether Simpson should bring a spare ozone generator to the site during its evaluation. (ECF No. 278, at 24.) Those emails show that Jones contacted Plaintiff to confirm that it did not need any parts and that Plaintiff responded by stating in part, "[w]e are not engineers so we have no idea what needs replaced." (Pl.'s SMF ¶ 60.) Simpson did not bring a replacement ozone generator to the site. Plaintiff argues that Simpson could not test or repair the system because of its failure to bring the generator; Defendant argues that it could not do so because of its lack of familiarity with the system. (*Id.* ¶ 66; Def.'s SMF ¶ 62.)

The Court concludes that this exchange falls far short of clear and convincing evidence of bad faith. As a threshold matter, the record does not support Plaintiff's assertion that Defendant made or reneged on a "promise" to replace the part: Plaintiff cites no record evidence for the assertion that Defendant "promise[d] to have Simpson to [sic] bring an ozone generator to the inspection," and points to no Policy provision or guarantee requiring Defendant to repair or replace

---

[18] Plaintiff's argument is that this oral report was not documented (*See* Pl.'s SMF ¶ 96.) But Gringauz, Simpson's investigator, confirmed that he reported his opinions during the inspection. (Def.'s SMF ¶ 64.) Gringauz also confirmed that his opinions were correctly described in a correspondence from HSB to Jones describing Simpson's opinions, which was in Florists' claim file. (Def.'s SMF ¶ 64.)

any component of the insured's equipment. (ECF No. 278, at 24.)[19] To the contrary, Defendant appears to have had already met its Policy obligations by issuing the payment for the ozone generator that Plaintiff declined. (Def.'s SMF ¶¶ 47, 51.) In any case, the Court concludes that even construing the facts in the most favorable light to the Plaintiff, the email exchange evidences a simple miscommunication between the parties about whether Plaintiff desired a replacement part and had authorized Defendant to purchase that part on its behalf.

Finally, Plaintiff generally proposes that instead of hiring Donan, Simpson, and Short, Defendant should have hired different consultants, such as "LWG Engineering" or Ozone Solutions, to evaluate TRH's ozone system. (*See* ECF No. 278 at 5, 23, 27.) But Plaintiff fails to point to any evidence that those consultants were either better qualified than the consultants that Defendant retained or that they would have reached different conclusions than Defendant's consultants.[20] And regardless, an insurance company "need not show that the process used to reach its conclusions was flawless." *Hamm*, 908 F. Supp. 2d at 670 (quoting *Mann v. UNUM Life Ins. Co. of Am.*, No. 02-1346, 2003 WL 22917545, at *7 (E.D. Pa. Nov. 25, 2003)). Even if Plaintiff succeeded in showing that Defendant's experts were not the *most* qualified, that would not provide clear and convincing evidence that Defendant acted in bad faith in using the experts that it did.

3. <u>Defendant Reasonably Communicated with Plaintiff</u>

Plaintiff also argues that Defendant concealed findings by Simpson and Short that would have supported coverage. (ECF No. 278, at 27–30.) The Court concludes that these contentions

---

[19] Plaintiff instead cites an invoice from Simpson to Defendant with a description of anticipated inspection charges. (Pl.'s SMF ¶ 65.) That invoice in fact notes that the quote does not include parts and labor to repair any equipment and reflects only charges to inspect and test the system. (ECF No. 277-10, at 17.)

[20] Defendant has since hired former Ozone Solutions expert Joel Leusink as a litigation consultant, and he has opined that no equipment besides the ozone generator suffered damage and that there was no mechanical breakdown of the ORP controller or sensor causing over-sterilization of the water and subsequent crop loss. (ECF No. 291, at 23.)

lack support in the record. First, Plaintiff again points to Defendant's instruction that Simpson not prepare a written report of its findings and opinions. (*Id.* at 29.) As the Court concluded above, because Simpson gave Plaintiff's representatives an oral report of its findings, a rational jury could not conclude that Defendant's decision not to request a written report was so unreasonable so as to be clear and convincing evidence of bad faith.

Similarly, Plaintiff argues that Defendant unreasonably withheld Short's report from September 15, 2015, until December 18, 2015. (*Id.* at 27–28.) Plaintiff argues that Defendant's delay in sending Short's report "effectively terminat[ed] any opportunity for Three Rivers' [sic] to question Short's findings and opinions set forth in his July 2015 report in advance of his November 2015 testing of Three Rivers' ozone system." (*Id.* at 6.) But record evidence does not indicate that Plaintiff was actually pursuing opportunities to question Short's facts and findings in this time period. Plaintiff never retained a consultant during the claim process and therefore did not have consultants present at Defendants' experts' tests and inspections. (ECF No. 291, at 26.) And when Defendant provided Short's reports and coverage letters to Plaintiff, Plaintiff never responded to Defendant's express invitation to contact it with any questions or facts not brought to its attention. (*Id.*) Far from presenting evidence of bad faith in the claims process, the record illustrates that Defendant communicated the results of its experts' inspections to Plaintiff throughout the claims process.

Finally, Plaintiff argues that Defendant failed to split the crop loss claim from the equipment damage claim. (ECF No. 278, at 25–27.) Defendant did, in fact, open a separate claim file to administer the equipment damage investigation, only days after Simpson's investigation concluded, on October 28, 2014. (Def.'s SMF ¶ 65.) But more importantly, the Court concludes that Plaintiff simply fails to explain how splitting the crop loss claim from the property damage

claim would have changed the outcome of Defendant's claims decisions or is any evidence of bad faith. The Court therefore agrees with Defendant that this argument is a "red herring" and does not constitute clear and convincing evidence of bad faith. (*See* ECF No. 291, at 28.)

The Court concludes that Plaintiff has failed to meet its burden of advancing record evidence of bad faith that would rise to the level required by the "clear and convincing" standard.[21] And although Plaintiff disagrees with Defendant's characterization of many of the facts underlying this claim, Plaintiff has failed to show that there is a genuine issue of material fact that if resolved in its favor could support a favorable verdict under the requisite legal standard. Accordingly, Defendant is entitled to judgment as a matter of law, and Defendant's Summary Judgment Motion is GRANTED on Plaintiff's bad faith claim.

### C.  Consequential Damages

Plaintiff seeks to recover consequential damages for Defendant's alleged breach of the insurance contract, including damages associated with the loss of its business. (Am. Compl. ¶¶ 130–40, 151.) Only Defendant moves for summary judgment on the question of consequential damages, arguing that it is entitled to judgment as a matter of law on this issue because Plaintiff cannot prove that any breach of a contractual duty caused its claimed damages. (ECF No. 279 ¶ 16.)

In a breach of contract action, the plaintiff has the burden of proving damages resulting from the breach. *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988). Consequential damages are available in a breach of contract action where such damages are foreseeable and were

---

[21] Decisions about whether to grant summary judgment are "guided by the substantive evidentiary standards that apply to the case." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 366 n.26 (3d Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). As is true here, "where the clear and convincing evidence standard applies, the trial judge must inquire whether the evidence provided is such that a jury applying that evidentiary standard could only find for one side." *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 522 (3d Cir. 2004).

contemplated at the time of contracting. *Ferrer v. Trs. of the Univ. of Pa.*, 825 A.2d 591, 610 (Pa. 2002). To recover damages for a contractual breach, a plaintiff must also establish a "causal relationship between the breach and the loss." *Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Serv. Co.*, 120 F. Supp. 3d 449, 459 (W.D. Pa. 2015) (quoting *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 878 (3d Cir. 1995)). To establish consequential damages associated specifically with the loss of a business, including lost profits, a plaintiff must prove that those damages (1) are calculable with reasonable certainty; (2) were proximately caused by the breach of contract; and (3) were reasonably foreseeable. *Co. Image Knitware, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 336 (Pa. Super. 2006) (citing *Birth Ctr. v. St. Paul Co.*, 787 A.2d 376, 387–88 n.15 (Pa. 2001)).

The Court has already determined that no rational jury could conclude that a contract breach occurred. But even if Defendant did breach the Policy by denying coverage, the Court concludes that Plaintiff's claim for consequential damages fails as a matter of law. Plaintiff cannot meet its burden of establishing a causal connection between the purported breach and Plaintiff's claimed loss of business because it has failed to advance facts that would establish that the ozone system was necessary to sustain its business.

Plaintiff's claim for consequential damages depends on the assertion that the ozone system was necessary for it to operate its business and that Plaintiff was forced out of business because Defendant breached the insurance contract by failing to replace or repair the ozone system. Plaintiff alleges in its Amended Complaint that it could not cultivate crops without the ozone system, arguing that it "cannot cultivate crops for retail sale without a fully functioning Ozone system with proper controls"; that the "entire Ozone system must be repaired or replaced before business operations can be safely, efficiently and effectively resumed"; and that Plaintiff was

unable to resume business operations as a "direct and proximate result of equipment breakdown and ozone system malfunction." (Am. Compl. ¶¶ 11, 127, 131.)

But Plaintiff has admitted in response to Requests for Admission both that "[a]n ozone system was not necessary for Three Rivers to grow its crops", and that "[o]zone is not necessary to grow crops hydroponically" in general. (ECF No. 282-15 ¶¶ 28–29.) As a result, those facts are "conclusively established" under Fed. R. Civ. P. 36(b). Similarly, Plaintiff's own crop damage expert, Thomas Graham, testified that Plaintiff did not need an ozone disinfection system to grow its crops. Graham also testified that "in general, an ozone system is not necessary to grow crops hydroponically," that hydroponic growers rarely use ozone systems to disinfect their water, and that hydroponic growers often use other disinfection methods or no disinfection method for their water. (Def.'s SMF ¶¶ 118, 119.)

Although Plaintiff previously proffered expert testimony from forensic accountant Shawn D. Fox to establish that Defendant's failure to repair or replace the ozone system caused damages associated with the loss of the business, Fox admitted that he had premised his opinion on the assumption that the ozone system was necessary for TRH to operate its business. (*Id.* ¶¶ 122–23.) When shown record evidence that the ozone system was unnecessary for the business's operation, Fox admitted that it was directly contrary to his assumptions. (*Id.* ¶ 124.) And the Court precluded Fox's testimony after Plaintiff failed to contest Defendant's motion *in limine* as to Fox. (ECF Nos. 250, 251.)

Plaintiff contests Defendant's Motion on this question by explaining that the profitability of its business depended on its ability to grow a single basil plant in about 6 weeks. (ECF No. 288 ¶ 198.) After the ozone system malfunctioned, Plaintiff alleges that its normal basil plants took

anywhere from 12 to 18 weeks to grow to full height and never reached full overall size. (*Id.* ¶ 201.) Plaintiff alleges that it consulted individuals experienced with use of chemical disinfectants to grow basil, but then reports that it was still unable to grow premium basil sufficient for sale. (*Id.* ¶ 200.)

Plaintiff also asserts that TRH's owners financed their business by investing more than $100,000 of their own money and obtaining $312,000 in loans from Elderton State Bank. (*Id.* ¶¶ 193–94.) After the ozone system failed, Plaintiff reports that it applied for and received additional loans from Elderton State Bank to purchase a new ozone system—but that, by the time that the bank approved funding in January 2015, Plaintiff had lost all of its clients. (*Id.* ¶ 202.) Plaintiff argues that if Defendant had paid Plaintiff the $26,000 crop loss limit in October 2014, it would have been able to purchase a new ozone system, avoid defaulting on its loans, and sustain its business. (ECF No. 290, at 36.) And Plaintiff finally argues that Defendant "coercively and in bad faith" tied the $26,000 crop loss payment "to a release of all claims" when Jones made a $30,000 settlement offer in October 2014. (*Id.*)

But Plaintiff has simply failed to point to any evidence supporting the assertion that a $26,000 payment for crop loss in October 2014 would have allowed Plaintiff to sustain its business. Plaintiff cites no financial documents or expert testimony supporting this argument and provides no reasoning beyond the bare assertion that a $26,000 payment not tied to a claim release would have prevented it from going out of business. Because Plaintiff has failed to point to any evidence, expert or otherwise, from which a reasonable jury could conclude that any breach of contractual duties by Defendant caused damages associated with the loss of Plaintiff's business, much less

damages that were foreseeable and contemplated at the time of contracting, Defendant is entitled to judgment as a matter of law on the consequential damages claim.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff cannot meet its burden to prove that Defendant breached the insurance contract. Additionally, no reasonable jury could find by clear and convincing evidence that Defendant (1) lacked a reasonable basis for its conduct in investigating TRH's claim or its decision to deny TRH's claim for alleged damages beyond the ozone generator; or that it (2) acted knowingly or in reckless disregard of a lack of a reasonable basis for its conduct and claims decisions. Florists is thus entitled to summary judgment on all remaining claims. And the Court concludes that even if summary judgment were not appropriate on the breach of contract claim, Plaintiff could not meet its burden to prove that any purported breach of contract caused consequential damages associated with the loss of its entire business.

Plaintiff's Motion for Partial Summary Judgment at ECF No. 274 is therefore DENIED in full, and Defendant's Motion for Summary Judgment at ECF No. 279 is GRANTED in full. An appropriate Order will issue.


/s/   Mark R. Hornak_____
Mark R. Hornak
Chief United States District Judge


Dated: December 29, 2021
cc:      All counsel of record

42